The first case on the call this afternoon is case number 122878, City of Chicago v. City of Kankakee and others. Agenda number five. Counsel, are you ready? You may proceed. Oh, and by the way, you've agreed to split your time. Yes. And our clerk will give you a three-minute warning. Okay. Thank you. Thank you. Mr. Chief Justice, other justices, members of the court, my name is Stephen Blonder, and I represent MTS Consulting, one of the appellants in this matter. I'll be splitting the argument with Mr. Joseph, who represents the City of Kankakee. I'll be addressing the jurisdictional questions. Mr. Joseph will be addressing the unjust enrichment and the home rule issue. This is a case in which the City of Chicago is asking the Circuit Court of Cook County to audit more than 24 companies and where their tax sales took place. They're asking that the court be empowered with something that's exclusively left to the Department of Revenue and to conduct these mini-audits over these 24 businesses, over these hundreds of thousands, if not millions of transactions, without the protections provided for in the Revenue Code, without the procedures, without the time frames, and they're asking that a court and not the agency that has exclusive jurisdiction address the issue. The Illinois Appellate Court, in ruling in how we got here, gave lip service to this court's holding in J&J Ventures, and they otherwise treated it as a nullity. They essentially wiped the holding off by saying you can have a different claim with a different label, and so long as you put that label on it, you can go to a court. Essentially, it goes to the old adage, it looks like a duck, it sounds like a duck, it quacks like a duck, it's still a duck. And whatever the claim, it goes to the Department of Revenue exclusively. There's nothing for a court to do. It bears understanding as to how we got here. In 2011, the City of Chicago filed a claim against Kankakee, Shanahan, and a couple of retail consultants. That claim was brought under Section 811.21, and that's important because that's a claim specifically provided for by the legislature, where it says one municipality can sue another municipality over sales taxes that were paid in the wrong place. It's a specific claim that's carved out by the legislature. Essentially, what they were saying was sales were being sourced in Kankakee, and those sales should have been sourced in Chicago, so Chicago lost out on that revenue. That was the city's theory in 2011 when they filed their first complaint, 2012 when they filed their second complaint, 2013 when they filed their third complaint. But alas, after that, the city flip-flopped, and they no longer said these sales should have been sourced in Chicago. Chicago should have gotten the revenue, but they flipped. In the third amended complaint, the fourth complaint in this matter, several years into litigation, they suddenly said these were out-of-state sales, and so the city should have gotten use tax. Again, what's different about this claim is it's not a claim anymore that says sales tax was paid to the wrong place, the claim specifically carved out by statute by the legislature. Instead, it's a new claim, and it's a claim saying these companies were citus, claim they were doing the citus of their sales in Kankakee, but really it was somewhere out-of-state, and they should have paid use tax. So it's not one municipality versus another saying who should get the revenue. It's something very different, and it's something outside the statutory framework that was provided for when a claim exists. And it's important to understand that distinction. Then we get to the fourth proposed amended complaint, so it's complaint number five after we've had the flip-flop, and they're still embarking on that strategy of the sales were citus outside the state, but this time they now try to add the Department of Revenue as a defendant. Judge Flynn looks at it and says, I don't have jurisdiction over any of this. It's something that exclusively J.J. Ventures hadn't been decided at that point, so it wasn't that he could rely on that opinion. But Judge Flynn looked at it and said, this isn't for a court. This is for the Department of Revenue. The city now before this court relies on the Chief Justice's opinion in Zon. That's really the only case that they point to that supports their position. That was a case where the Seventh Circuit certified a question to this court about whether a claim had to go to the ICC or whether there was jurisdiction. This court said, no, there's jurisdiction based on the statutory framework, the statutory language. In that case, it involved an heiress, and it said heiresses were specifically exempted under the statute from going before the agency. Looked at the rest of the statute that provided for claims in court, that was an easy decision for this court because it clearly wasn't something that was exclusively left to an agency. This case is more like J.J. Ventures. When we look at it, they're asking the court to do an audit, something that the legislature gave to the Department of Revenue. Because what has to happen here? You need to go into these companies, look at their source documents, go look and say, okay, where did the sale take place, look at their ledgers, look at their records. It's an audit. If you look at the Department of Revenue website that defines an audit, you take those same procedures. That's what they're asking the court to do now. That's a function that the tax code, the legislative framework, it's well-developed. No one disagrees that it's a statutory framework that didn't exist at the common law. No one disagrees that it's comprehensive. Again, the city, us, the appellate court, everyone agrees on that. But where we diverge is where the appellate court went off the rails and said, well, yeah, we get that. We see J.J. Ventures. We agree with that holding. We lay out that holding. We lay out the rationale. But then we say, but this is unjust enrichment. Again, go back to it looks like a duck, sounds like a duck, it's still a duck. This is still an audit. However you want to look at it. It's we're going to go through and assess exactly where a sale took place. The revenue codes provide for the Department of Revenue to do that. And what would be the result be if we're going to say that courts can have this? You could find theoretically 200 municipalities in the state all bringing a use tax claim. Because after all, use tax gets split between all the municipalities in the state. So what they're doing is saying let's override the circuit courts with a plethora of cases. And they say in their brief, well, you don't have to really worry about that because it won't happen. The RTA in their amicus brief points out three cases brought by the RTA alone. So it is happening. And Judge Flynn was right in the first instance to say this doesn't belong in a courtroom. The appellate court was right to say we have a framework to look at this in. And we see it goes to the Department of Revenue. Again, where they fell off the tracks was by looking at the label of the claim and not sending it to the Department of Revenue. The city's other big argument is they're left without a remedy. There's nothing they can do. That's not right either. All one has to do is look at City of Kankakee versus the Department of Revenue. In that case, you've got various writs of prohibition. You've got writs of mandamus. You've got things that can happen. It happened there. The appellate court even recognized that it was appropriate to do. They also could bring a claim against the Department of Revenue on a mandamus claim. And you have the 81121 claim that they started this litigation with but abandoned that says you can sue a municipality for a misallocation of sales tax. So there's neatly carved out ways that the city can prosecute its claim. The one before this court is not the way to do it. I cede to Mr. Joseph the rest of the time. Thank you. Mr. Chief Justice, counsel, and may it please the Court, my name is James Joseph and I represent the City of Kankakee. The appellate court should be reversed for two reasons that are related to what Mr. Blonder said in the context of exclusive jurisdiction but conceptually distinct. First, there is no private right of action and certainly no cause of action in equity to enforce what is manifestly a set of statutory rights and obligations that provide for their own remedies. Second, the plaintiffs are home rule units, and in seeking to enforce a set of rights and obligations that are by their nature a matter of statewide dimension arising out of conduct that did not occur within their jurisdictional limits. They are exceeding their home rule authority under Article 7 of the Constitution. As to the first point, there is no such thing as a common law right to use tax revenue. As this court said in People v. AT&T, taxation is a legislative, not a judicial function, and the court reiterated that just as recently as a few weeks ago in the Oswald v. Hamer case where it said that the power of taxation in the General Assembly is plenary. There is a very clear cascade of authority as to how these claims arise. The seed or the wellspring of authority for taxation is set forth in Article 9, Section 1 of the Constitution, which says that the General Assembly has, quote, unquote, exclusive power over taxation. The General Assembly has enacted a variety of statutes that affect the matters in this case, and it has authorized the Department of Revenue in the exercise of its discretion to enforce those laws, in particular under Section 2505-300 of the Revenue Law. The General Assembly has enacted if not thousands, perhaps hundreds of tax acts, scores or dozens of which are applicable in this case, and six that I would like to focus the court's attention on. They include the Department of Revenue Law, the State Finance Act, the State Revenue Sharing Act, the Use Tax Act, the Retailer's Occupation Tax Act, and the Illinois Municipal Code, and in particular Article 8, Division 11, which concerns revenue. That is the entire universe of tax law rights and obligations, and they didn't exist at common law. And as this court said in the Kosicki v. S. A. Hewitt case 80 years ago, where a statute creates a new right or imposes a new duty or liability unknown to the common law, and at the same time gives a remedy for its enforcement, the remedy so prescribed is exclusive. That's what the General Assembly did in this case. The plaintiffs styled their claim as one for unjust enrichment, but in fact it seeks to correct tax reporting allocations that the Department of Revenue had within its purview to correct. There are several statutes that authorize the department to do that. I'd like to draw the court's attention to a couple of them in particular. One of them is Section 2505-475 of the Department of Revenue Law, which states as an example of the kind of correction the Department of Revenue can make, quote, recording a use tax payment as retailer's occupation tax or a retailer's occupation tax payment as use tax. That is exactly the situation that we have here. That is exactly the claim the cities are bringing here. There are similar statutes in some of these other acts. For instance, the State Finance Act, Section 6Z-18, and Section 8-11-16 of the Municipal Code provide for the same sort of allocation power to the Department of Revenue. Now, as Mr. Blonder indicated, that doesn't mean there's no remedy for the city if it has a complaint about what the Department of Revenue does. As in the city of Kankakee case, as in the city of Champaign case, there is a remedy, either a writ of prohibition or a writ of certiorari. And the key feature of that particular action is, number one, that it involves statutory rights and obligations, and number two, that it's an action against HIDOR. And if, in the first instance, if they hadn't concocted these latter-day claims with this new theory in their fourth or fifth complaint, if they had brought their action originally, that's what they could have done. Allowing the plaintiff's theory in this case is bad policy because it has no limiting principle. In theory, any putative tax beneficiary can sue any tax revenue beneficiary because of the actions of a third party in reporting their taxes. One can imagine all kinds of mischief that can result from that sort of unlimited theory. Here, as Mr. Blonder indicated, the General Assembly creates a remedy and knows how to do it in the appropriate situations. So in the case of 8-11-21, it created a remedy for retailers' occupation tax missourcing, but the General Assembly has never enacted a similar provision with respect to use tax sales. That means it doesn't exist. Let me turn briefly to the Home Rule point. Article 7, Section 6A of the Illinois Constitution states that a Home Rule unit may exercise any power and perform any function pertaining to its government and affairs. And this Court has consistently ruled that that allows a municipality, a Home Rule municipality, to engage in regulation that governs the corporate actions of citizens within its own jurisdictional limits. This Court has held that it does not permit a municipality to engage in acts that have, quote, an extraterritorial impact on other units of local government, as this Court said in Blanchard v. Barrios, or to, quote, regulate a state institution such as the court system, as this Court said in Calavimus v. Village of Morton Grove. But that's exactly what the plaintiffs in this case proposed to do. They proposed to exercise their authority in such a way that will affect 200-plus other municipalities and units of local government on what even they acknowledge is, by definition, a statewide system of taxation. In the City of Kankakee case, I'm sorry, in the City of Champaign case, the Court said, the instant case concerns only statutory law, although it comes cloaked in an equitable garment. It's an ancient maxim of this Court that we look to the substance rather than the form of the complaint, and the substance of the complaint in this case is one to enforce state tax liabilities. I'll reserve the rest of my time. Thank you. Thank you. May it please the Court, I'm Julian Henricus, and I'm arguing today on behalf of the City of Chicago and the Village of Skokie. We have alleged that several brokers and Internet retailers engaged in a scheme that enabled Kankakee to receive substantial tax revenue to which it was not entitled to the significant financial detriment of Chicago and Skokie. The retailers made sales outside Illinois of merchandise to be used within Illinois, but falsely reported that they made the sales in Kankakee and wrongfully paid sales tax rather than use tax on the transactions. This enabled Kankakee to improperly receive the municipal allotment of the sales tax revenue while depriving Chicago and Skokie of tens of millions of dollars in use tax revenue, and out of the sales tax revenue Kankakee wrongfully obtained, it paid substantial rebates to the brokers, and the brokers in turn paid significant portions of the rebates to the retailers. The appellate court held that we stated unjust enrichment claims and that the circuit court has subject matter jurisdiction. In their PLA and their briefs, defendants challenged only the jurisdictional ruling. They did not challenge the ruling on the merits, and thereby forfeited any challenge to that ruling. And while the amicus brief filed in support of defendants addressed the merits, that did not put the issue before this court because this court's review is limited to the issues presented in the PLA. Now, I noticed that this morning, and I was surprised by this, that counsel for Kankakee argued that the merits issue is before this court. They didn't argue the merits issue in their brief. I'll nevertheless turn to it after discussing the jurisdictional issue. The appellate court correctly ruled that the circuit court has subject matter jurisdiction over our claims. With two exceptions, not relevant here, the Illinois Constitution grants circuit courts original jurisdiction of all justiciable matters. This court held in skilling that the General Assembly may nonetheless vest exclusive jurisdiction over certain matters in an administrative agency, but only if it does so explicitly by using exclusionary language that divests the circuit court of jurisdiction. In the Village of Itasca case, the appellate court applied skilling to hold that the circuit courts have original jurisdiction over disputes about the situs of sales for sales tax purposes. And in Beeler, the appellate court reached the same conclusion for use tax purposes. In both cases, this was because the relevant statutes contained no explicit language divesting the courts of jurisdiction. Of course, in the JJ pending case, the court went on and discussed skilling and in some sense distanced it from that narrow holding that you just said. We said there, yet skilling's description of the analysis in NLR Industries is truncated and does not represent the full measure of this court's jurisprudence in ascertaining legislative integrity to vest exclusive jurisdiction in an administrative agency. In fact, NL Industries considered the relevant statute as a whole and the court referenced not only the lack of exclusionary language, but also other statutory provisions. Pretty clearly, the pending case has a broader analysis in terms of exclusivity. It certainly does and with good reason. That was a very unusual case because the statute in that case, the Illinois Gaming Act, was very unusual. It conferred exclusive jurisdiction on the Department of Revenue to enforce contracts pertaining to the location of the gaming instruments in bars or other locations. But what it didn't do, and curiously it didn't do, it didn't confer exclusive jurisdiction on the gaming board to determine whether those contracts were valid. So we have this strange situation at issue there where the statute created an anomaly. And this case recognized that anomaly and understood that it would have been essentially impossible for a court to first decide whether a contract was valid, but not be able to enforce it. A party would have to go to the court to, after going to the court, the party would have to go to the Department of Labor. This court recognized that anomaly and so tweaked the law concerning jurisdiction to accommodate that circumstance. We have no similar circumstance in this case. There is no such anomaly in this case. This case fits perfectly within the contours of the law outside of cases like J&J, the J&J case, which is, as I said, an anomaly. And this court, after J&J, seems to have recognized that in Zahn because the court reiterated in Zahn that if the, by stating expressly, in Zahn, three, two months after J&J, if the legislature intends for exclusive original jurisdiction to lie with the agency rather than with the circuit courts, when it has enacted a comprehensive statutory scheme, it must make that intention explicit. Here, no statute contains exclusionary language, divesting the courts of jurisdiction over tax disputes. Zahn also noted that support exists for the argument that courts should consider the overall statutory framework, but found that the application of that approach would not change the result in that case. The appellate court recognized that in Section 8-11-21, the legislature showed that it knows how to carve out some jurisdiction for the courts. And then it finds that not to extend jurisdiction to a similar claim for out-of-state missourcing would be absurd, right? That's what they said. Is that right? Who said that? I'm sorry. The appellate court? I don't think the appellate court said that, but I would like to address what Your Honor said. Maybe you can address the question. If they did say that, if the legislature really overlooked the situation when it enacted 8-11-21, and I'm not saying there's any evidence that it did, then the legislature could always amend the statute to extend circuit court jurisdiction, couldn't it? Well, I think that that concept misreads the notion of jurisdiction. Again, the Constitution expressly confers jurisdiction on the circuit court's overall justiciable matters, and that's important. That's why in Skilling the court said, look, if for the legislature to nevertheless confer jurisdiction on an agency in the face of the constitutional provision saying that jurisdiction over all justiciable matters is conferred on the circuit court, then the General Assembly is going to have to say specifically not only that the agency has jurisdiction, but specifically divest the circuit courts of that jurisdiction. The statute that you're talking about, 8-11, which confers jurisdiction on the municipalities for certain kinds of cases under the sales tax, was an affirmative grant by the legislature. The legislature said nothing to indicate that such an action, that an action like ours for unjust enrichment could not be brought also to gain revenue that was mis-sourced under the sales tax itself, the same statute at issue in 8-11-1, I think. But moreover, nothing, there was nothing, no statute suggested that the legislature deprive municipalities of being able to sue under the use tax. The legislature would have had to have expressly divested the courts of jurisdiction to bring actions under the use tax, and it didn't do that. And that was clear from Skilling, and while Skilling was certainly tweaked by this court, and I said reasonably in J&J, in the J&J case, the kind of tweak that was necessary in the J&J case is not presented in this case. There is no anomaly like the unusual anomaly that was presented in the J&J case. Counsel, can I ask you a little bit about the remedy here? Your opposing counsel said that what you're really asking for is an audit. In other words, what would have to happen in this case is that the court would have to examine the actual filings for thousands and thousands of transactions and make determinations as to where they took place and then have to recalculate the amounts and then redistribute, an audit. Certainly that would sound as if those are functions that the legislature has given to the Department of Revenue. So are you asking for something else, or are you asking for an audit as it's been described here? No. Well, I mean, the interesting thing here is that, by the way, the Department of Revenue shortly after this court decided its Hartnett case and changed the rules regarding how to determine the situs of sales for tax purposes, the Department of Revenue said, look, we're going to discontinue all audits regarding pre-Hartnett sales. Obviously that had something to do with lack of resources in the agency. They needed to shift their gears to try to make sure that they promulgated new regulations to effectuate this court's ruling in Hartnett and didn't have the resources to be able to undertake all kinds of audits with respect to sales tax cases. But this is not an audit. The circuit courts conduct discovery. And during the discovery already undertaken in this case, and that's how we learned this happened, we have uncovered all of these transactions. We know which transactions should have been reported as use tax rather than sales tax. It's simply a matter of codifying all of those, giving those to the other side, arguing about the ones concerning which there may be a dispute, and then have the circuit court enter summary judgment in these cases. Are these thousands and thousands of transactions? Well, I don't know how many transactions there are. But it's a simple matter for us to sit down and put them in a couple of different tiles. And my understanding is that it's very clear which transactions were sent through the brokers in Kankakee, and all of those transactions sent through the brokers, none of those was the brokers didn't perform the function of deciding where the purchase order was accepted. That was the test preheartening, and all of those transactions are subject to the preheartening test. So it's a simple matter. So they use the word audit, but audit has substantial overlap with the notion of discovery in circuit court cases. The court doesn't have to do the audit. The parties will litigate the cases by advocating which of the transactions are transactions that should have been subject to USTACs and which of the transactions were not. Is there going to be a trial in each one of these thousands of transactions? Well, there shouldn't be a trial. I think all of those are clear. I think there's no genuine issue of material fact with respect to all or almost all of those transactions. Almost all of those transactions that form the millions of dollars in USTACs revenue that the city of Chicago was deprived of and that Kankakee got in the form of sales tax revenue, almost all of those, there's no genuine issue of material fact in those cases. So this simply is not a part of what's involved in this case. Mr. Enrique, has the Department of Revenue taken any action against the defendants? As far as I know, no, they have not. As far as I know, they have no idea what happened. They didn't do the audit. Had they done the audit, then we probably wouldn't be here today. But they chose not to do the audit, and we had the right to bring a cause of action for unjust enrichment. For example, their argument is, look, all these transactions are so enmeshed in the tax laws and the tax laws are a comprehensive legislative scheme, so it's ridiculous to let us sue for an unjust enrichment claim, which is a common law claim, rather than pursue our relief under the tax statutes. But we couldn't pursue the relief under the tax statutes. We don't have the right to force IDOR to exercise its discretion to do audits, and we can't mandamus them either because it's a discretionary matter to do the audits, and mandamus doesn't allow discretionary matters. So we had to. The only way that we could have done this is to sue for unjust enrichment. But the fact that this case entails the tax laws does not change the fundamental character of this case. So, for example, if I'm entitled to a refund of state income tax, but the Department of Revenue in sending the check to me in an envelope puts an incorrect digit in my address and it goes to my neighbor, my neighbor opens the envelope, takes the check, caches it, certainly I'm entitled to sue that neighbor for unjust enrichment, even though all of the income tax laws, which is the basis for that refund check, is subject to comprehensive regulation as well. The mere fact that comprehensive regulation is involved does not deprive the courts of jurisdiction to do, to entertain a claim like ours for unjust enrichment. Can you address the, I think it's called vigilante concern, the floodgates concern? Yes. This is not a novel theory of ours. This was a theory that was first raised in the Village of Itasca case with respect to sales taxes and was then adopted in the Beeler case with respect to use taxes. In the 13 years since the Village of Itasca case, there have only been four cases of which we are aware. In which any party has sued even under the sales tax and use tax statutes. And we are not aware of a single case in which anybody has raised a similar theory with respect to the income tax law. So this is a specter of horribles that simply does not apply. We certainly would have seen that happen in all those years since these theories were first accepted. We simply adopted somebody else's theory. And so I don't, there's nothing to their vigilante argument. I see that my time is almost out. Unless the court has additional questions, I will end mine. I'll ask the court to affirm the judgment of the appellate court. Thank you. Thank you. Reply. I'd like to start with counsel's example of the refund check that was delivered to the wrong person. That's a case where the Department of Revenue had already made the determination who should get the check. And it was sent to the wrong place. Here, there's been no determination made as to who's entitled to what in terms of the taxes. Department of Revenue signs off on the returns. So it's theoretically, not theoretically, practically speaking, it goes back to Kankakee. It goes back to the retailers. So there's no entitlement in that example that counsel used in terms of the city being entitled to anything. They're playing judge and jury and jumping to the end saying, well, we've already looked at all the records and we've decided we're right, so therefore it doesn't involve taxes because we know we're right. So the court can just bless that and give a summary judgment. But that's not what the inquiry is. The inquiry is, where did the sales take place? And who is entitled to that revenue? And then you've got to sit and start recalculating if it's use tax, the share of all 200 municipalities in the state in terms of who gets what. Everything that's done by the Department of Revenue. I'm also cognizant of the Village of Niles case against Kmart where the court said that the liabilities and procedures that Niles seeks to impose are without support in the statute since enforcement and administration of the statute is vested exclusively in the Department of Revenue. That's the exact scenario that they're trying to bring here. That's number one. Number two, Justice Thomas, you asked a question about couldn't the legislature have changed the statute. Village Itasca comes down in 2004. The legislature in 2004 adopts 81121, which says there's a cause of action for sales tax between two municipalities. It happens contemporaneous with Village Itasca. So the legislature, seeing that case in the same time frame, they created one specific claim. They didn't create a claim for use tax. They certainly could have, but they chose not to. That's evidence of the legislative intent. Counsel made the statement in response, I think it was Justice Burke, your question about audits, what's the Department of Revenue done. My clients, MTS Consulting, pre-Hartney, they were audited multiple times. So there were audits the Department of Revenue did. Some of them were open at the time Hartney was decided, and the department may or may not have decided to continue those. But many of these retailers were audited at different times in the past. Again, as an officer of the court, MTS was certainly audited. At times there may have been revenue that was then shifted from one place to another, saying this sale should have been cited somewhere else. That happened. The system was working. What Hartney did was change the standard and said, hey, it's a multifaceted test, instead of just where is the last kind of act in the sales acceptance process. And that went to the Department of Revenue's determination. Again, it's an audit. What was most telling to me from Justice Tice, your question, to the city about, well, aren't you really asking them to do an audit, was the lack of an answer. Because, again, the things that would have to happen here, in terms of going through the documents, the information, the facts, is akin to an audit. And the way the city gets around is by saying, well, we're entitled to the money anyways. It's ours. So all the court needs to do is simply rule that it comes to us. What they're doing is they're circumventing the whole process of figuring out where the site is that the sale is, such that whether it's a sales tax issue, a use tax issue, or who gets it. And by going to the end and saying, well, we presuppose we get it. So, therefore, just give it to us. Is there any import that is the real problem that the department won't correct the situation itself because of its decision not to go back pre-Hartney? It won't look at the matter involved in this suit? Is that why we're here? I don't think so because I think some of these are pre-Hartney. Some may even be post-Hartney. Because there was some taxitis reporting in Kankakee and or Shanahan post-Hartney. So, Justice Thomas, a lot of it may be pre-Hartney and the department's decision to not conduct further audits or complete certain audits that were open. And, again, there were many audits that they did that had been completed prior to that time frame. But either way, that's a decision for the Department of Revenue. And counsel made the answer. I don't remember whose question it was where he said, well, we have no remedy because they're not completing the audits. Sure they do. All they had to do was raise with the Department of Revenue the issue that certain revenues weren't passed back to them, at which point they have the writ of certiorari, they have the writ of prohibition, they have the writ of mandamus at that point because at that point the department has acted. And even if it's within its discretion or failure to exercise that discretion, they have a remedy. And that's what we learned from city of Kankakee versus Department of Revenue. Do you recall my question regarding the appellate court finding it to be an oversight? I remember generally your question, yes. And counsel indicated he didn't think they said that. Did they or didn't they? I don't recall the exact language of the appellate court decision. Again, as we read the appellate court decision, they adopted the J&J Ventures approach and then gave it lip service by saying, well, this is unjust enrichment, so we don't have to follow that. And that, by the way, Justice Tyson, in response to your initial question, is the most telling point here, is J&J Ventures is not an anomaly. All it says is we look at both the express language and the entire statute to understand what was happening. And if it was an oversight of the legislature, your position is the legislature should fix it. It shouldn't be done judicially. Exactly. And that's 81121. They made a decision, again, same time as Village Vitasca. They could have done it broader. They didn't. They adopted one position. I note that my time is up. Mr. Joseph will address the rest. Thank you. I'd just like to make two quick points. First of all, with respect to counsel's representation that we hadn't raised the issue of the unjust enrichment claim, that's simply not correct. It was point number two of our petition for leave to appeal, which we addressed on pages 14 through 17 of that document. It was pages 28 through 32 on our main brief and not pages 11 through 14 of our reply brief. We certainly did raise the question of whether a cause of action exists outside of the statutory scheme. What counsel may be referring to is what the exact elements of the cause of action may be, and that may not be before the court. However, to a certain extent, that's irrelevant. Because the question is, was there wrongdoing here? And the premise of the plaintiff's theory is that there was some false reporting out there. So that's the wrong that they're alleging. And if they're claiming that everybody reported their taxes appropriately, then there can't be any unjust enrichment. If the claim is that they didn't report their taxes appropriately, then there's a statutory claim. As to Justice Thomas' question about what the appellate court held, it did say that the question of whether 8-11-21 should apply rendered that that can't displace the use tax argument, and that would be absurd. But they misunderstood the issue with respect. They understood the issue to be whether 8-11-21 itself precludes a use tax claim, and that's not what we were arguing. What we were arguing is that the existence of 8-11-21 shows that when the General Assembly wants to create a remedy for tax missourcing, it knows how to do so. With that, we would request that the court reverse the judgment of the appellate court and affirm the judgment of the circuit court. Thank you very much. Thank you. Case number 122878, City of Chicago et al. v. City of Kankakee et al. will be taken under advisement as Agenda Number 5. Mr. Blonder, Mr. Joseph, Mr. Enriquez, we thank you for your arguments, and you are excused.